IN THE SUPREME COURT OF NORTH CAROLINA

No. 290A24

Filed 14 August 2026

K.H., A MINOR, BY AND THROUGH HER GUARDIAN AD LITEM, JOHN HARTMAN

v.

DANIELLE L. DIXON, INDIVIDUALLY AND IN HER OFFICIAL CAPACITY, AND ALAMANCE-BURLINGTON BOARD OF EDUCATION

Appeal pursuant to N.C.G.S. § 7A-30(2) (2023) from the decision of a divided panel of the Court of Appeals, 296 N.C. App. 62 (2024), affirming an order entered on 17 April 2023 by Judge Michael L. Robinson in Superior Court, Alamance County. Heard in the Supreme Court on 17 September 2025.

*Fox Rothschild LLP, by Matthew Nis Leerberg, Nathan W. Wilson, and Margaret McCall Reece, for plaintiff-appellant.*

*Tharrington Smith LLP, by David B. Noland and Joshua E. Renz, for defendant-appellee Alamance-Burlington Board of Education.*

*Brooks, Pierce, McLendon, Humphrey & Leonard, L.L.P., by Elizabeth L. Troutman and William A. Robertson, for North Carolina School Boards Association, amicus curiae.*

EARLS, Justice.

K.H. (Katherine)[1] was a student at a public middle school in the Alamance-Burlington School District in the fall of 2022. She alleges that one day that semester,

---

[1] A pseudonym to protect the minor's privacy and for ease of reading.

her teacher violently attacked her in her classroom in front of other students, and that the Alamance-Burlington Board of Education (the Board) responded by first suspending Katherine, then revoking that suspension after news outlets covered the attack, and then transferring Katherine to an alternative school without her input.

In addition to suing her teacher, Ms. Danielle Dixon, for these alleged events, Katherine sued the Board for its allegedly inadequate hiring and supervision of Ms. Dixon and its response to Ms. Dixon's actions. In particular, Katherine brought a *Corum* claim directly under the North Carolina Constitution, asserting that the Board's conduct infringed on her constitutional right to the opportunity to access a sound basic education and that she lacked another adequate state law remedy. *See Corum v. Univ. of N.C.*, 330 N.C. 761, 782 (1992).

We agree with Katherine that her complaint against the Board states a colorable constitutional claim and that she lacks an adequate other state remedy for the Board's actions. *See Deminski ex rel. C.E.D. v. St. Bd. of Educ.*, 377 N.C. 406, 413 (2021) (summarizing the three *Corum* elements as applied to an individual constitutional claim under Article I, Section 15 and Article IX, Section 2 of our state constitution). Although the "fundamental right" to "equal access to participation in our public school system," *Sneed v. Greensboro City Bd. of Educ.*, 299 N.C. 609, 618 (1980), does not generally hold school districts liable for the intentional torts of their teachers, it does make local authorities responsible for responding reasonably to such incidents once they occur. Failing to do so may constitute "deliberate[ ] indifferen[ce]

to conduct that prevent[s schoolchildren] from accessing their constitutionally guaranteed right to a sound basic education." *Deminski*, 377 N.C. at 414. Katherine's allegations, if proved, would support the conclusion that the Board responded unreasonably to Ms. Dixon's assault when it suspended Katherine and then transferred her to a new school, and that its deliberate indifference to the situation impaired Katherine's academic performance and caused her to suffer negative educational consequences.

Because Katherine's complaint did state a *Corum* claim, the trial court erred by granting the Board's motion to dismiss this claim under Civil Procedure Rule 12(b)(6). We reverse the Court of Appeals' contrary decision and remand this action for further proceedings consistent with this opinion.

## I.  Background

### A. The Assault and the Board's Response

Katherine's complaint alleged the following, which we assume to be true in reviewing the decision to grant the Board's Rule 12(b)(6) motion to dismiss. *E.g.*, *Jones v. J. Kim Hatcher Ins. Agencies*, 387 N.C. 489, 492 (2025).

In the fall of 2022, Katherine was a student at Broadview Middle School, a public school in the Alamance-Burlington School District. Danielle Dixon was one of Katherine's assigned teachers. Ms. Dixon's teaching license expired in 2015, and she was not licensed at the time she was assigned to be Katherine's teacher. On 2 November 2022, when Katherine "was attending school" and "attempted to walk into

her assigned classroom to retrieve her bookbag," "[Ms. Dixon] blocked [Katherine's] path with her arm." Katherine was only "approximately three inches away and still moving forward" when Ms. Dixon put out her arm, and because of that "close proximity," Katherine "was unable to avoid any contact" and ran into Ms. Dixon's arm.

After that contact, Ms. Dixon "grabbed [Katherine] and pulled her inside of the classroom while closing the door." She then proceeded to violently beat Katherine. First, "[Ms. Dixon] grabbed [Katherine] by the hair and slammed [Katherine] into the door with enough force to break a broom that was located between [Katherine] and the wall and door area." Ms. Dixon then "forcefully slammed [Katherine] to the ground" by her hair. Ms. Dixon then continued to "slam[ ] [Katherine's] head into the ground" at least four more times while grasping the back of Katherine's head and hair. During the assault, students inside the classroom "began yelling" for Ms. Dixon to release Katherine and stop harming her. Upon hearing this "yelling and commotion," "two other teachers entered the room and called for help." Katherine "attempted to defend herself but was unable to because of [Ms.] Dixon's large size and age advantage."

The complaint also included still images that allegedly capture the unfolding assault, apparently taken by a student onlooker. The images similarly show a teacher figure pinning a student figure to the wall behind a classroom door, forcing the student to the floor, grasping the student's head and hair while the student's legs are

splayed out, and appearing to yell at another teacher figure who approached her during the assault.

After the attack, Katherine experienced bruises, hair loss from where Ms. Dixon had grabbed her, and ongoing emotional distress. The superintendent for the Board, Dr. Dain Butler, initially suspended Katherine for ten days. But when "video of the altercation was made available to local news outlets," the Board reversed that decision. Still, Katherine was not allowed to return to Broadview Middle School. Instead, she was transferred to Ray Street Academy, an alternative school, without her input or consent. This cumulative disruption, starting with the assault and followed by the suspension and transfer, meant that Katherine "was forced to change her schools," her "academic performance . . . was placed in peril," and she "suffered educational consequences."

## B. The Complaint and Subsequent Proceedings

On 5 January 2023, Katherine, by and through her guardian ad litem, sued Ms. Dixon in her individual and official capacities, as well as the Board. Against both defendants, Katherine brought claims for damages for assault and battery, negligent infliction of emotional distress, intentional infliction of emotional distress, and violations of the North Carolina Constitution Article I, Section 15, and Article IX, Section 2. Against the Board specifically, she also brought a claim of negligent hiring, retention, and supervision of Ms. Dixon. Katherine alleged that, in addition to teaching without an active teacher's license and attacking Katherine, "[Ms.] Dixon

had multiple issues within her classroom with other students and [faced] disciplinary actions by the Principal of Broadview Middle School," and that the Board failed to investigate whether Ms. Dixon "had the emotional capacity" and adequate training to teach minor children.

The Board moved to dismiss the complaint on 21 February 2023. As grounds to dismiss Katherine's tort claims under Civil Procedure Rules 12(b)(1) and 12(b)(2), the Board invoked sovereign immunity, arguing that those claims were barred because the Board had not waived its immunity up to the extent of its insurance coverage under N.C.G.S. § 115C-42. The Board also moved to dismiss Katherine's constitutional claim under Rule 12(b)(6) for failure to state a claim.

The trial court agreed and dismissed Katherine's tort claims against the Board because "the Complaint does not sufficiently demonstrate a basis for waiver of the Board's sovereign immunity as required under Rules 12(b)(1)–(2)." The trial court also granted the Board's motion to dismiss Katherine's constitutional claim under Rule 12(b)(6) because "the Complaint falls short of alleging facts giving rise to the type of claims contemplated in *Deminski*." Katherine's claims against Ms. Dixon in her individual capacity remained.

Katherine appealed, and the Court of Appeals affirmed. *K.H. v. Dixon*, 296 N.C. App. 62, 72 (2024). First, the Court of Appeals concluded that it had jurisdiction to entertain Katherine's interlocutory appeal because "appeals raising issues of governmental or sovereign immunity affect a substantial right sufficient to warrant

immediate appellate review." *Id.* at 64 (quoting *Kawai Am. Corp. v. Univ. of N.C. at Chapel Hill*, 152 N.C. App. 163, 165 (2002)). Katherine's appeal fell within this precedent, it reasoned, because the trial court dismissed her tort claims on grounds involving sovereign immunity and dismissed her constitutional claim for failure to state a claim. *Id.* at 65 (first citing *Hinson v. City of Greensboro*, 232 N.C. App. 204, 209 (2014); and then citing *Horne v. Town of Blowing Rock*, 223 N.C. App. 26, 29 (2012)).

As to the merits, the Court of Appeals agreed with the trial court that Katherine had not adequately pleaded a waiver of sovereign immunity under N.C.G.S. § 115C-42 and thus dismissal was appropriate. *Id.* at 65–67. The court also agreed that Katherine failed to allege facts to show that she "was subjected to *repeated* or *ongoing* issues with Dixon" and thus failed to state a claim for constitutional injury under *Deminski. Id.* at 71.

On this last point, Judge Murphy dissented. He would have held that Katherine's complaint, taken as a whole, adequately alleged that the Board "was deliberately indifferent to the hostile environment it created when it placed" an unqualified, unlicensed, and inadequately trained and supervised individual in a classroom and when it suspended Katherine after her teacher attacked her. *Id.* at 78–79 (Murphy, J., concurring in part and dissenting in part). The Board's actions, in his view, were sufficient to support allegations of an injury to Katherine's constitutional rights to a sound basic education in our public schools. And because he agreed that

Katherine's common-law actions were barred by sovereign immunity, no other adequate state remedy exists for her injuries and her *Corum* claim should be allowed to proceed. *Id.* at 79.

Katherine appealed to this Court as of right based on Judge Murphy's dissent. N.C.G.S. § 7A-30 (2023) (repealed 2023).

## II. Analysis

### A. Jurisdiction

First, this Court has subject matter jurisdiction to hear Katherine's constitutional claims against the Board. *See In re K.J.L.*, 363 N.C. 343, 346 (2009) ("[A] court's lack of subject matter jurisdiction is not waivable and can be raised at any time."). Subject matter jurisdiction is, fundamentally, "a court's 'power to pass on the merits of a case.' " *Askew v. City of Kinston*, 386 N.C. 286, 297 (2024) (quoting *Slattery v. Appy City, LLC*, 385 N.C. 726, 729 (2024)). In part because "the state judiciary . . . has the responsibility to protect the state constitutional rights of the citizens," a court's authority to hear *Corum* claims specifically "flows from the 'authority granted to it by the Constitution.' " *Id.* at 298–99 (first quoting *Corum*, 330 N.C. at 783–84; and then quoting *Henderson County v. Smyth*, 216 N.C. 421, 423 (1939)). According to her pleadings, Katherine's claims against the Board arise directly under the North Carolina Constitution, specifically Article I, Section 15, and Article IX, Section 2, for harms the Board allegedly inflicted upon her personally. Her complaint thus activated the court's subject matter jurisdiction by alleging

" 'infringement of a legal right' secured by the Constitution and [by] present[ing] a justiciable controversy." *Id.* at 299 (quoting *Comm. to Elect Dan Forest v. Emps. Pol. Action Comm.*, 376 N.C. 558, 608 (2021)); *Deminski*, 377 N.C. at 414 (concluding that allegations of a "school's deliberate indifference to ongoing student harassment" stated a "colorable constitutional claim" under Article I, Section 15 of the North Carolina Constitution).

After this Court heard argument on the merits of the issues on appeal, we directed the parties to file supplemental briefing on whether the Court of Appeals had appellate jurisdiction over Katherine's appeal. *See K.H. v. Dixon*, 388 N.C. 513 (2025) (order). Although we have had multiple occasions to consider whether an interlocutory order granting a motion to dismiss on sovereign immunity grounds is immediately appealable, as the Court of Appeals has held, this Court has yet to resolve the merits of that issue. *E.g.*, *Farmer v. Troy Univ.*, 382 N.C. 366, 369 n.1 (2022) (declining, as in *Teachy v. Coble Dairies, Inc.*, 306 N.C. 324, 328 (1982), to "decide whether a motion to dismiss on the basis of sovereign immunity is properly designated as a Rule 12(b)(1) motion or a 12(b)(2) motion," only the latter of which is immediately appealable under statute (quoting *Estate of Long v. Fowler*, 378 N.C. 138, 142 n.1 (2021))).

In their supplemental briefing, both Katherine and the Board contended that the Court of Appeals did have such jurisdiction. They argued that Court of Appeals precedent correctly holds that an interlocutory order granting a motion to dismiss

based on governmental immunity is immediately appealable under the substantial rights doctrine, as is an order denying the same. *E.g.*, *Ballard v. Shelley*, 257 N.C. App. 561, 564 (2018); *Greene v. Barrick*, 198 N.C. App. 647, 649–50 (2009).

As an alternative to the substantial rights justification, Katherine further argued that sovereign immunity is a matter of personal jurisdiction, so adverse rulings on such grounds are immediately appealable under N.C.G.S. § 1-277(b) (2025) ("*Any* interested party has the right of immediate appeal from an adverse ruling as to the jurisdiction of the court over the person or property of the defendant . . . ." (emphasis added)). Further, fairness considerations support applying a rule of mutual appealability because procedural rules "must be applied equally to all parties to a lawsuit," she argued, quoting *Goins v. Puleo*, 350 N.C. 277, 281 (1999). Once the Court of Appeals had jurisdiction over the tort claims dismissed based on immunity defenses, Katherine reasoned, it had attendant jurisdictional authority to review dismissal of her *Corum* claim.

In addition, both Katherine and the Board argued that immediate appellate review was warranted because the posture of the claims before the trial court risked inconsistent verdicts on the same factual issues—namely, whether Ms. Dixon in fact assaulted Katherine and whether that assault caused Katherine emotional distress. *See, e.g.*, *Gardner v. Richmond County*, 386 N.C. 594, 595 (2024) (per curiam) (reversing the Court of Appeals for failing to apply the doctrine of inconsistent verdicts to allow an immediate appeal of the dismissal of claims by one plaintiff when

-10-

claims by another plaintiff that raised the same issues were allowed to proceed); *Bernick v. Jurden*, 306 N.C. 435, 439 (1982) (holding that "the possibility of inconsistent verdicts in separate trials" from an order allowing summary judgment for some but not all defendants "affects the substantial right . . . to have one jury decide whether the conduct of one, some, all or none of the defendants caused his injuries").

We agree with this basis for appellate jurisdiction—the posture of the claims below indicates a risk of inconsistent verdicts on the same factual issues. The risk of inconsistent verdicts doctrine arises when there is "a risk of two actual trials resulting in two different verdicts" on the same issues. *Foster v. Crandell*, 181 N.C. App. 152, 162–63, *disc. rev. denied*, 361 N.C. 567 (2007). That circumstance can occur where claims against multiple defendants involve identical legal issues and some but not all of those claims are dismissed before trial. *E.g.*, *Cook v. Bankers Life & Cas. Co.*, 329 N.C. 488, 491 (1991) (concluding that a risk of inconsistent verdicts existed where common issues of agency, waiver, estoppel, and the necessity of consent arose across distinct claims against two defendants and the trial court granted summary judgment in favor of one defendant but not the other). That risk can also arise where the factual issues underlying separate claims are substantially the same, and some of the claims will proceed while others will not. *E.g.*, *Green v. Duke Power Co.*, 305 N.C. 603, 608 (1982) (noting that undergoing a second trial affects a substantial right when there is "the possibility that a party will be prejudiced by different juries in

separate trials rendering inconsistent verdicts on the same factual issue"); *SciGrip, Inc. v. Osae*, 373 N.C. 409, 433 n.9 (2020) (concluding that two breach of contract claims brought against two defendants posed a risk of inconsistent verdicts because factual issues in the conduct giving rise to both claims overlapped, and holding that the order granting summary judgment to the plaintiff on one claim but not the other was immediately appealable). In these cases, "the possibility of separate trials involving the same issues which could lead to inconsistent verdicts" affects a substantial right. *Hamby v. Profile Prods., L.L.C.*, 361 N.C. 630, 634 (2007); *see also Cook*, 329 N.C. at 491 ("[W]e hold that the order dismissing the case as to [one defendant but not the other] affected a substantial right of the plaintiff which she will lose if it is not corrected before a final judgment is entered.").

Here, even as the trial court dismissed all of Katherine's claims against the Board, Katherine's separate tort claims against Ms. Dixon remain. The record indicates that the trial court filed an entry of default against Ms. Dixon on 20 February 2023. That sort of Rule 55(a) entry of default "is only an interlocutory act looking toward subsequent entry of final judgment of default." *E.g.*, *Estate of Teel v. Darby*, 129 N.C. App. 604, 607 (1998) (citing *State Emps. Credit Union, Inc. v. Gentry*, 75 N.C. App. 260, 265 (1985)). An entry of default can be set aside prior to a final judgment of default upon "good cause shown" under Civil Procedure Rule 55(d). N.C.G.S. § 1A-1, Rule 55(d) (2025). Thus, on this record, were Katherine unable to obtain immediate appellate review of the order dismissing her claims against the

Board, and were Ms. Dixon to successfully move to set aside the entry of default, it is still possible that Katherine would proceed to a first trial on the merits of her claims against Ms. Dixon. Further, if the dismissal of her claims against the Board was overturned on appellate review, she could face a second jury trial on the merits of the Board's conduct. Although Katherine's constitutional claims against the Board are distinct from her tort claims against Ms. Dixon, many of the same factual issues must be resolved in both—including the alleged events relating to the assault and the extent of harm to Katherine. That would risk exposing Katherine to inconsistent verdicts on the same factual issues. On this basis, the trial court's otherwise interlocutory order dismissing her claim against the Board but not against all defendants affects Katherine's substantial rights and grants her an immediate right of appeal. *See Gardner*, 386 N.C. at 595.[2]

## B. Katherine's Claim under Article I, Section 15 and Article IX, Section 2 of the North Carolina Constitution

---

[2] Because we conclude that the risk of inconsistent verdicts supports Katherine's immediate right of appeal, we are satisfied of our own appellate jurisdiction and subsequently do not reach the issue of whether Katherine also has the right to appeal based on her substantial rights in "orders raising issues of governmental or sovereign immunity," as the Court of Appeals put it. *See K.H. v. Dixon*, 296 N.C. App. 62, 65 (2024) (quoting *Hinson v. City of Greensboro*, 232 N.C. App. 204, 209 (2014)). After all, our review is cabined by another limitation on our appellate jurisdiction, namely that we obtained review of this matter through an appeal as of right based on a dissent at the Court of Appeals. *See* N.C.G.S. § 7A-30(2) (2023) (repealed 2023). In turn, the dissent did not dispute the majority's conclusion as to Katherine's right to immediate appeal, perhaps because the dissent was similarly bound by long-standing Court of Appeals precedent. *See K.H.*, 296 N.C. App. at 73 (Murphy, J., concurring in part and dissenting in part). Issues not "specifically set out as the basis for the dissent" are not preserved for this Court's appellate jurisdiction arising from an appeal based on that dissent. *See Cryan v. Nat'l Council of YMCAs of the U.S.*, 384 N.C. 569, 570 (2025). We leave this jurisdictional issue for future resolution.

Katherine alleges that the Board violated her constitutional right to equal access to a sound basic education in our public schools when it hired an unlicensed and unqualified teacher, failed to adequately train and supervise that teacher, and responded to the teacher's physical attack on Katherine in a classroom by suspending Katherine, reversing that decision when news outlets reported about the altercation, and then transferring her to an alternative school without her input.

We agree with Katherine that her allegations as to the Board's conduct after the alleged assault do state a colorable constitutional rights violation, the second element of her *Corum* claim. Because the other two elements are similarly met, the trial court wrongly dismissed Katherine's constitutional claim against the Board under Rule 12(b)(6).

### 1. *Applicable Legal Principles*

We review an order granting a motion to dismiss under Rule 12(b)(6) de novo. *Farmer*, 382 N.C. at 369. "On a Rule 12(b)(6) motion, well-pleaded allegations of fact in the complaint are treated as true," and "[f]actual inferences should be viewed in the light most favorable to the nonmoving party." *Cato Corp. v. Zurich Am. Ins. Co.*, 386 N.C. 667, 672 (2024) (cleaned up).

In *Corum v. University of North Carolina*, 330 N.C. 761 (1992), this Court "recognized a direct action under the State Constitution against state officials for violation of rights guaranteed by the Declaration of Rights." *Id.* at 783. Sovereign immunity is no defense to such claims. *Craig v. New Hanover Cnty. Bd. of Educ.*, 363

N.C. 334, 338 (2009). In *Deminski*, we explained that an individual student could bring such *Corum* claims against local education authorities for deliberate indifference to the conduct of others that deprived that student of access to their constitutionally guaranteed education rights: "Notably, the right to a sound basic education rings hollow if the structural right exists but in a setting that is so intimidating and threatening to students that they lack a meaningful opportunity to learn." *Deminski*, 377 N.C. at 414. These types of *Corum* claims, we explained, require a claimant to meet three elements to "sufficiently allege[ ] a claim for relief under Article I, Section 15 and Article IX, Section 2": (1) that a state actor violated the student's right to access a sound basic education; (2) that the claim is colorable; and (3) that there is no other adequate remedy under state law, meaning that the claimant at least has "the opportunity to enter the courthouse doors and present his claim." *Id.* at 413–14 (cleaned up).

### 2. Application

The trial court ruled that Katherine's complaint fell short of articulating a claim under *Deminski*. But that determination rests on an overly narrow interpretation of our precedent and the constitutional right at stake.

The North Carolina Constitution vests in every schoolchild a right to the opportunity to access a sound basic education. *Leandro v. State*, 346 N.C. 336, 345, 347 (1997). This "fundamental right" is rooted in the text, structure, and history of our Constitution as well as our precedent. *See id.* at 348; *Sneed*, 299 N.C. at 618.

Specifically, Article I, Section 15 places an affirmative duty on "the State to guard and maintain" the "right to the privilege of education." Article IX, Section 2 guarantees a uniform public school system "wherein equal opportunities shall be provided for all students." This mandatory language creates an obligation on the State to "take charge of the education of its citizens," *Lane v. Stanly*, 65 N.C. 153, 158 (1871), and reflects the framers' intent to constitutionally "establish and secure . . . a system of free popular education," *Collie v. Comm'rs of Franklin Cnty.*, 145 N.C. 170, 175 (1907) (cleaned up).

This constitutional requirement is not opportunity in name only. Reading the constitution as a whole, these two articles "combine" to guarantee schoolchildren the opportunity to access a quality education. *See Leandro*, 346 N.C. at 347. And these directives require the State and localities to provide "a safe environment where learning can take place," *Deminski*, 377 N.C. at 412–13, and where "considerations of procedural due process" apply, *Sneed*, 299 N.C. at 618. Local education agencies in particular have an important role to play in delivering on "the duty of the State to guard and maintain" the right to access a sound basic education. N.C. Const. art. I, § 15. Because "[e]ducation is the corner-stone of a political fabric," especially for a government based on "popular suffrage," local authorities charged with "instruction of the children" occupy positions of great trust and authority essential to safeguarding constitutional education rights. *Smith v. Sch. Trs.*, 141 N.C. 143, 154–55 (1906).

Two of our precedents bear directly on Katherine's allegations. In *Deminski* we recognized that "a government entity with control over the school" could be liable to a student for its "deliberate[ ] indifferen[ce] to ongoing harassment that prevents [that] student from accessing his constitutionally guaranteed right to a sound basic education." 377 N.C. at 407. That was so even as the harassment was allegedly perpetrated only by fellow students, not any public employees. *Id.* at 407–09. There we noted that the harassment of the plaintiff students by fellow students was allegedly "severe and discriminatory," *id.* at 410, and "ongoing," and the school and local school board knew about it yet "failed to take adequate action," *id.* at 414. We relied in part on federal court interpretations of Title IX, which bars recipients of federal education funding from denying educational benefits or equal participation in an educational program to students based on sex. *See id.* (citing *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 644–47 (1999)). Under Title IX, "severe, pervasive, and objectively offensive" "student-on-student harassment" may "den[y] its victims the equal access to education that Title IX is designed to protect." *Davis*, 526 U.S. at 652.

The second relevant case is *Sneed v. Greensboro City Board of Education*, 299 N.C. 609 (1980). There we concluded that our state constitutional requirement of a general and uniform system of free public schools does not bar public schools from "charging [ ] modest, reasonable fees . . . to support the purchase of supplementary supplies and materials for use by or on behalf of students." *Id.* at 617 (emphasis

omitted). The state constitution does, however, limit a public school's ability to charge such fees under threat of penalty to "a student who cannot pay required fees because of real economic hardship." *Id.* at 618. We concluded that, to survive constitutional scrutiny, mechanisms must exist so that "all students and their parents are given adequate and timely notice" of how they may be eligible to have such charges waived and "the simple procedures by which they may confidentially apply for" that waiver. *Id.* at 619. Such procedural safeguards were necessary to protect the fundamental right of "equal access to participation in our public school system," we reasoned, because otherwise students might inevitably feel they must forgo educational opportunities to avoid the "stigma" of being singled out on the basis of their socioeconomic status or because they are unaware of possible relief. *Id.* at 618–19.

Taken together then, *Deminski* and *Sneed* underscore that local school authorities may not be deliberately indifferent to extreme, in-school conduct that deprives a student of the opportunity to access a sound basic education on equal terms. A governmental entity must respond reasonably, including with adequate procedural protections, to incidents of severe harassment or assault that would make schoolchildren more vulnerable to future harassment or deprive them of their opportunity to access a sound basic education. *See Doe v. Fairfax Cnty. Sch. Bd.*, 1 F.4th 257, 274 (4th Cir. 2021) ("[A] school may be held liable under Title IX if its response to a single incident of severe sexual harassment, or the lack thereof, was clearly unreasonable and thereby made the plaintiff more vulnerable to future

harassment or further contributed to the deprivation of the plaintiff's access to educational opportunities."); *Fitzgerald v. Barnstable Sch. Comm.*, 504 F.3d 165, 172–73, 175 (1st Cir. 2007) (recognizing that "a single instance of peer-on-peer harassment theoretically might form a basis for Title IX liability if that incident were vile enough and the institution's response, after learning of it, unreasonable enough to have the combined systemic effect of denying access to a scholastic program or activity," and noting that "an institutional response to harassment may be carried out so inartfully as to render it clearly unreasonable"), *rev'd on other grounds*, 555 U.S. 246 (2009); *Davis*, 526 U.S. at 648 (noting that deliberate indifference to acts of student-on-student harassment occurs where an institution's "response . . . or lack thereof is clearly unreasonable in light of the known circumstances").

Here Katherine's complaint does state a colorable claim under Article I, Section 15, and Article IX, Section 2. Assuming her allegations are true and taking factual inferences in her favor, Katherine's teacher violently assaulted her in a manner that required intervention by two other teachers and led to significant physical injury. Yet the Board and its administrators responded by *suspending Katherine* for ten days. They only reversed that suspension after news outlets learned details of the attack. Even still, the Board and administrators further responded by transferring Katherine to an alternative school without her input. The cumulative effect of these events impaired Katherine's ability to learn and jeopardized her academic performance. Effectively punishing a student when a teacher violently

assaults her in the classroom is clearly unreasonable. Such deliberate indifference by the Board states a colorable constitutional claim that the government actor denied Katherine equal access to a sound basic education.[3]

Because the second element of *Deminski* is met, we also address the final two elements to assess whether the trial court erred by dismissing Katherine's *Corum* claim. The first element, that defendant Alamance-Burlington Board of Education, is a state actor, is satisfied. *See Deminski*, 377 N.C. at 414. The third element is met,

---

[3] To the extent that Katherine alleged a constitutional claim because Ms. Dixon's intentional torts "are imputed to Defendant Board pursuant to the doctrines of agency and/or *respondeat superior*," because Ms. Dixon lacked a valid teaching license at the time of the attack, or because the Board was on notice that Ms. Dixon was likely to violently assault a student because of unspecified earlier "issues within her classroom with other students and disciplinary actions by the Principal," the trial court correctly determined that these allegations alone are too vague and therefore insufficient to state a claim under Article I, Section 15 and Article IX, Section 2. As in other contexts, local school boards are not vicariously liable for the intentional torts of their employees, because "intentional tortious acts are rarely considered to be within the scope of an employee's employment." *Medlin v. Bass*, 327 N.C. 587, 594 (1990) (cleaned up). Moreover, the allegations do not establish a factual relationship between the earlier "issues" of which the Board and its administrators had notice and Ms. Dixon's eventual assault of Katherine. *Cf. Davis*, 526 U.S. at 652–53 (noting that Congress likely intended Title IX's private damages actions to apply to those incidents "serious enough to have the systematic effect of denying the victim equal access to an educational program or activity[,] . . . in light of the inevitability of student misconduct and the amount of litigation that would be invited by entertaining claims of official indifference to a single instance of one-on-one peer harassment").

The dissent raises the possibility that the Board may not have had a full understanding of what transpired when the Board initially decided to suspend Katherine. *See* dissent *infra* Part II. To be sure, the evidence may ultimately show that the Board acted reasonably. But a Rule 12(b)(6) motion asks specifically whether, taking the facts and factual inferences in the light most favorable to the nonmoving party, the complaint states a valid legal claim. *E.g.*, *Cato Corp. v. Zurich Am. Ins. Co.*, 386 N.C. 667, 672 (2024). We hold only that Katherine's allegations were sufficient to meet that standard.

This decision does not afford bellicose students a constitutional claim when they are appropriately disciplined for their own participation in a school fight. The facts alleged here are plainly more severe than a simple schoolyard tiff. Moreover, trial courts and defendants have plenty of tools at their disposal to quickly dispose of frivolous lawsuits.

too: Katherine seeks monetary damages for her injuries. The Board successfully obtained dismissal of Katherine's tort claims against it based on sovereign immunity. An alternative remedy is not adequate when it is barred by sovereign immunity because "a plaintiff must have at least the opportunity to enter the courthouse doors and present his claim." *Craig*, 363 N.C. at 340. Additionally, Katherine's tort claims against Ms. Dixon would redress Katherine's alleged injuries only for the assault; however, they do not redress her alleged injury by the Board for its response to this assault and the "educational consequences" she "suffered" that violated her right to equal access to a sound basic education. *See Askew*, 386 N.C. at 294 ("*Corum* requires courts to disaggregate the rights violated, the constitutional harms alleged, and the appropriate remedy on the facts of the particular case." (cleaned up)). Without her *Corum* claim, Katherine lacks another remedy at law against the Board specifically for its conduct. Thus, Katherine's complaint satisfies all three elements of *Deminksi*.

### III.   Conclusion

Because Katherine's complaint states a colorable constitutional claim that a government actor failed to guard and maintain her right to access a sound basic education as a result of its deliberate indifference to a severe instance of misconduct, and because she lacks another adequate state law remedy, the trial court erred by dismissing her *Corum* claim against the Board on a Rule 12(b)(6) motion. Accordingly, the Court of Appeals erred by affirming the same. We reverse that portion of the

decision below and remand this matter for further proceedings consistent with this opinion.

REVERSED AND REMANDED.

Justice ALLEN concurring.

The complaint alleges that a teacher brutally—and unjustifiably—assaulted plaintiff K.H. at school and that school officials in the Alamance-Burlington School System responded by suspending plaintiff and then moving her to an alternative school against her will. I agree with the majority that, if these allegations are true, the school district's reaction to the attack violated plaintiff's educational rights under the North Carolina Constitution.

In *Sneed v. Greensboro City Board of Education*, 299 N.C. 609 (1980), this Court recognized that Article I, Section 15 and Article IX, Section 2(1) of the state constitution combine to make "equal access to participation in our public school system . . . a fundamental right." *Sneed*, 299 N.C. at 618. If a student's right to access the public school system on equal terms with other students means anything, surely it means that a school district may not suspend and then involuntarily reassign an innocent student for being severely beaten by an out-of-control teacher.

I write separately to emphasize the narrowness of today's decision. Like the facts alleged in *Deminski v. State Board of Education*, 377 N.C. 406 (2021), the facts alleged by plaintiff are extreme. The plaintiff in *Deminski* alleged that her three children were targeted by other elementary school students, who severely bullied them and subjected them to graphic acts of sexual harassment over a period of several months. *Deminski*, 377 N.C. at 407–09. The plaintiff further alleged that "the

bullying and harassment continued with no real change" even after: (1) one of the plaintiff's children informed a teacher of the harassment; (2) the plaintiff herself "repeatedly notified the teacher, assistant principal, and principal of the situation"; and (3) the defendant school board learned of the incidents. *Id.* at 409.

Because "the school's [alleged] deliberate indifference to ongoing student harassment created an environment in which [the *Deminski* plaintiff's children] could not learn," we held that the complaint asserted a colorable constitutional claim against the defendant school board. *Id.* at 414. In so ruling, we reasoned that "the right to a sound basic education [recognized in *Leandro v. State*, 346 N.C. 336 (1997),] rings hollow if the structural right exists but in a setting that is so intimidating and threatening to students that they lack a meaningful opportunity to learn." *Id.*

It seems reasonable to assume that most school officials would not react with almost total indifference to bullying and sexual harassment of the sort alleged in *Deminski*. Similarly, one would expect that school officials in general are highly unlikely to respond to a teacher's brutal and unprovoked assault on a student by punishing the student.

Given that this case involves such an improbable set of alleged facts, the majority's opinion should not be interpreted to expose ordinary student discipline decisions to *Deminski*-style challenges. As the majority points out, "[t]he facts alleged here are plainly more severe than a simple schoolyard tiff . . . ." Majority *supra* Section II.B.2 n.3. I would go further and say that they differ materially from

situations in which, for example, two students accused of fighting blame each other for starting the fight. So long as school officials act in good faith and in accordance with procedural safeguards, they are not prohibited from disciplining students for misconduct merely because the students deny wrongdoing. To hold otherwise would deprive school officials of the disciplinary tools necessary to preserve a safe and orderly school environment. Because I do not understand today's decision to hamstring school officials in this way, I join the majority's opinion.

Chief Justice NEWBY and Justice BARRINGER join in this concurring opinion. Justice DIETZ concurs in this opinion but does not join the majority opinion.

Justice BERGER dissenting.

Plaintiff's complaint fails to allege a colorable constitutional violation, and with minimal analysis and no support from precedent, the majority's far-reaching opinion creates grounds for constitutional claims out of routine disciplinary actions taken by schools. The narrow "deliberate indifference" standard articulated in *Deminski*, which required a pattern of misconduct, is no more because the majority has abandoned restraint to reach an isolated incident of misconduct at the hands of a teacher.

But the merits should not be reached at all because the Court of Appeals did not have jurisdiction over plaintiff's interlocutory appeal. I respectfully dissent.

## I. Jurisdiction

The burden of establishing appellate jurisdiction rests solely with the party seeking to appeal. N.C. R. App. P. 28(b)(4) ("An appellant's brief shall contain . . . [a] statement of the grounds for appellate review."); *see also Denney v. Wardson Constr., Inc.*, 264 N.C. App. 15, 17 (2019) ("[T]his Court will not construct arguments for or find support for appellant's right to appeal from an interlocutory order on our own initiative. That burden falls solely on the appellant. As a result, if the appellant's opening brief fails to explain why the challenged order affects a substantial right, we must dismiss the appeal for lack of appellate jurisdiction." (cleaned up)). Here, plaintiff relied on N.C.G.S. § 7A-27(b)(3)(a) and § 1-277 as the basis for appellate jurisdiction over the trial court's interlocutory order granting the Board's motion to

dismiss. However, because it was doubtful that either provision established jurisdiction, we ordered supplemental briefing. Plaintiff continued to assert that jurisdiction exists pursuant to N.C.G.S. § 7A-27(b)(3)(a) and § 1-277.

But the majority nonetheless declines to decide the primary issue raised by the supplemental briefing, instead avoiding the obvious jurisdictional flaw to reach the merits. But jurisdictional rules cannot be ignored, even when judges are eager to make law.

"Generally, there is no right of immediate appeal from interlocutory orders and judgments." *Goldston v. Am. Motors Corp.*, 326 N.C. 723, 725 (1990). But an interlocutory order that "[a]ffects a substantial right" is immediately appealable. *See* N.C.G.S. § 7A-27(b)(3)(a) (2025). "[A]n interlocutory order affects a substantial right if the order deprives the appealing party of a substantial right which will be lost if the order is not reviewed before a final judgment is entered." *Sharpe v. Worland*, 351 N.C. 159, 162 (1999) (cleaned up); *see also Byrd v. Avco Corp.*, 389 N.C. 32, 40 (2026). A "substantial right" is "one materially affecting those interests which a person is entitled to have preserved and protected by law." *Land v. Whitley*, 388 N.C. 296, 303 (2025) (cleaned up). "[T]he appellant has the burden of showing [the appellate court] that the order deprives the appellant of a substantial right which would be jeopardized absent a review prior to a final determination on the merits." *Jeffreys v. Raleigh Oaks Joint Venture*, 115 N.C. App. 377, 380 (1994).

"[T]he denial of summary judgment on grounds of sovereign immunity is

immediately appealable, though interlocutory, because it represents a substantial right[.]" *Craig ex rel. Craig v. New Hanover Cnty. Bd. of Educ.*, 363 N.C. 334, 338 (2009). The logic here is simple: when a governmental actor asserts sovereign immunity, "the entitlement is an *immunity from suit* . . . and it is effectively lost if a case is erroneously permitted to go to trial." *Id.* (cleaned up). Thus, the denial of a motion for summary judgment or a motion to dismiss based on immunity "unquestionably affects a substantial right" because, "if the governmental agency were forced to litigate the case to judgment before appealing the immunity ruling, it could deprive the government of *its* right not to have to appear in court and defend the case at all." *Ballard v. Shelley*, 257 N.C. App. 561, 564 (2018) (emphasis added). In other words, the government's right to immunity is "los[t] if the order is not reviewed before final judgment." *Byrd*, 389 N.C. at 40 (cleaned up).

But the issue here is not deprivation of the government's right to sovereign immunity. Instead, plaintiff is commandeering the government's substantial right to manufacture appellate jurisdiction. This doesn't make sense. When a trial court grants a motion to dismiss based on immunity, is the non-governmental actor deprived of a substantial right unique to him or her? Of course not. The non-governmental entity "is in the same position as any other litigant whose claim was dismissed for lack of jurisdiction." *Ballard*, 257 N.C. App. at 564. "One might assume, therefore, that an appeal from an order *granting* a motion to dismiss based on sovereign or governmental immunity would not automatically affect a substantial

right, simply because the ruling involved immunity." *Id.* But the majority declines the opportunity to clarify or explain how a party that is not cloaked with immunity loses a sovereign-immunity-based substantial right asserted by the opposing party.

The Court of Appeals, without regard to which party is cloaked with immunity, has "repeatedly held that appeals *raising* issues of governmental or sovereign immunity affect a substantial right." *Kawai Am. Corp. v. Univ. of N.C. at Chapel Hill*, 152 N.C. App. 163, 165 (2002) (cleaned up) (emphasis added). In other words, according to the Court of Appeals, so long as one party has a substantial right, either party can bootstrap an interlocutory appeal. The majority declines the opportunity to rectify this approach despite the fact that it is both atextual and unfair.

Subsection 1-277(b) as a jurisdictional basis is similarly unavailing. That provision states that "[a]ny interested party has the right of immediate appeal from an adverse ruling as to the jurisdiction of the court *over the person or property of the defendant . . . .*" N.C.G.S. § 1-277(b) (2025) (emphasis added). This subsection only "permits the immediate appeal of an order denying a motion made pursuant to Rule 12(b)(2) to dismiss for lack of jurisdiction over the person, [but it] does not apply to orders denying motions made pursuant to Rule 12(b)(1) to dismiss for lack of subject matter jurisdiction." *Teachy v. Coble Dairies, Inc.*, 306 N.C. 324, 327 (1982). In other words, subsection 1-277(b) can serve as grounds for plaintiff's appeal only if sovereign immunity is a matter of personal jurisdiction.

This Court has yet to answer that question, but it should. *See id.* at 327. In

*Teachy*, we described the competing arguments.

> A viable argument may be propounded that the State, as a party, is claiming by the doctrine of sovereign immunity that the particular forum of the State courts has no jurisdiction over the State's person. On the other hand, the doctrine may be characterized as an objection that the State courts have no jurisdiction to hear the particular subject matter of tort claims against the State.

*Id.* (cleaned up).

The latter is the better characterization. First, sovereign immunity is offense-specific. Our courts clearly have jurisdiction over governmental actors in a variety of suits. *See, e.g.*, *Corum v. Univ. of N.C.*, 330 N.C. 761, 785–86 (1992) ("The doctrine of sovereign immunity cannot stand as a barrier to North Carolina citizens who seek to remedy violations of their rights guaranteed by the Declaration of Rights."); *Cedarbrook Residential Ctr., Inc. v. N.C. Dep't of Health and Hum. Servs.*, 383 N.C. 31, 45 (2022) ("[B]y enacting the State Tort Claims Act, the State partially waived its sovereign immunity by consenting to direct suits brought as a result of negligent acts committed by its employees in the course of their employment." (cleaned up)). Further, governmental actors may be sued in their individual as opposed to official capacities, indicating that sovereign immunity is not a question of courts' all-or-nothing power over the government's "person"; rather, when sovereign immunity is raised, courts have no authority over the "subject matter" of that particular suit. *See Teachy*, 306 N.C. at 327; *see also Powelson v. United States*, 150 F.3d 1103, 1104 (9th Cir. 1998) ("[S]overeign immunity is not merely a defense to an action against the

United States, but a jurisdictional bar." (quoting 16 *Moore's Federal Practice* § 105.21 (3rd ed. 1998))).

The majority avoids answering this question, asserting that "[i]ssues not 'specifically set out as the basis for the dissent' are not preserved for this Court's appellate jurisdiction arising from an appeal based on that dissent." (Quoting *Cryan v. Nat'l Council of YMCAs of the U.S.*, 384 N.C. 569, 570 (2025).) But this assertion misses the point entirely. "[O]ur appellate jurisdiction is derived from that previously acquired in the court from which the cause is removed[.]" *Gordon v. Sanderson*, 83 N.C. 1, 2 (1880). Accordingly, the issue at hand is whether the Court of Appeals had appellate jurisdiction in the first instance. "[W]hen the appeal is interlocutory[,] the appellant has the burden of showing in his brief to [the appellate court] that . . . the order appealed from deprives the appellant of a substantial right[.]" *Abe v. Westview Capital, L.C.*, 130 N.C. App. 332, 334–35 (1998) (cleaned up). The scope of the dissent below is irrelevant to this jurisdictional inquiry.

Further, although claiming that the issue is beyond the scope of this Court's review, the majority also devotes nearly six pages to attempting to explain the basis for appellate jurisdiction in this case. Ultimately, the majority concludes that "the posture of the claims below indicates a risk of inconsistent verdicts on the same factual issues" and affects a substantial right. Specifically, the majority holds that "many of the same factual issues . . . including the alleged events relating to the assault and the extent of harm to Katherine" would need to be resolved in both the

present case and in a trial against Ms. Dixon, thus raising a risk of inconsistent verdicts.

But the events of the assault and plaintiff's injuries are largely uncontested. In its brief to this Court, the Board concedes that Ms. Dixon assaulted the student. Given that the Board has not argued these facts and that a video of the incident exists, it is unlikely that separate juries would reach inconsistent verdicts as to the "assault and the extent of harm to [plaintiff]."

Regardless, it is even less likely that a trial against Ms. Dixon will proceed. The trial court entered default judgment against Ms. Dixon over three years ago in February 2023. Neither party has claimed that Ms. Dixon seeks to set aside this judgment. But the majority's conclusion rests on the mere possibility that, upon motion from Ms. Dixon, the trial court could set aside the default judgment "[f]or good cause shown" and "in accordance with Rule 60(b)." N.C.G.S. § 1A-1, Rule 55(d) (2025). Under Rule 60(b), the court may set aside judgment for:

> (1) Mistake, inadvertence, surprise, or excusable neglect;
>
> (2) Newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b);
>
> (3) Fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party;
>
> (4) The judgment is void;
>
> (5) The judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has

been reversed or otherwise vacated, or it is no longer
equitable that the judgment should have prospective
application; or

(6) Any other reason justifying relief from the operation of
the judgment.

N.C.G.S. § 1A-1, Rule 60(b) (2025). There is no indication that Ms. Dixon will be

positioned to assert a successful motion to set aside the default judgment entered

against her under any of the grounds outlined in Rule 60(b), and I am not persuaded

that a risk of inconsistent verdicts supports interlocutory jurisdiction here.

Regardless, plaintiff failed to raise this alternative basis for jurisdiction at the Court

of Appeals, so the argument is waived. *Viar v. N.C. Dep't of Transp.*, 359 N.C. 400,

402 (2005) ("It is not the role of the appellate courts . . . to create an appeal for an

appellant.").

Because there is no risk of inconsistent verdicts and neither subsection 7A-

27(b)(3)(a) nor section 1-277 provides grounds for an interlocutory appeal when a

motion to dismiss based on sovereign immunity is granted, plaintiff failed to

demonstrate a basis for appellate jurisdiction and we should dismiss this appeal.

## II.    Plaintiff's *Corum* Claim

After the majority runs around the jurisdictional hurdle, it expands our

precedent regarding *Corum* claims for violations of the right to a sound basic

education nearly beyond recognition by making a single incident of teacher

misconduct grounds for a constitutional claim. To the extent there was some

modicum of restraint in our *Corum* jurisprudence in this space, the governor has been

taken off by the majority.

"Article I, Section 15 and Article IX, Section 2 of the North Carolina Constitution combine to guarantee every child of this state an opportunity to receive a sound basic education in our public schools." *Deminski v. State Bd. of Educ.*, 377 N.C. 406, 412 (2021) (quoting *Leandro v. State*, 346 N.C. 336, 347 (1997)). "[E]qual access to participation in our public school system is a fundamental right, guaranteed by our state[.]" *Sneed v. Greensboro City Bd. of Educ.*, 299 N.C. 609, 618 (1980).

To assert a *Corum* claim in the educational context, a claimant must sufficiently allege (1) that a state actor violated the student's constitutional rights; (2) that the claim is colorable, meaning it presents facts sufficient to support an alleged violation of a right protected by the State Constitution; and (3) that there is no adequate state remedy. *Deminski*, 377 N.C. at 413–414. For purposes of this dissent, I do not dispute elements (1) and (3) are met.

Regarding element (2), the majority claims that *Deminski* and *Sneed* "bear directly" on plaintiff's claim. In *Deminski*, we "consider[ed] whether an individual may bring a claim under the North Carolina Constitution for a school board's deliberate indifference to continual student harassment." *Id.* at 407. There, "[o]ver a period of several months," three elementary school students were bullied and sexually harassed by other students. *Id.* Specifically, the complaint alleged physical and sexual harassment that included students "push[ing] [the plaintiff's] spine so that she was in pain and had trouble breathing and swallowing" and another student

"pull[ing] down his pants in the hallway in [the plaintiff's] presence to expose his penis." *Id.* at 407–09. Crucially, the various forms of harassment occurred repeatedly "[t]hroughout the school day" and "on multiple occasions." *Id.* at 407–08. All three plaintiff-students were subjected to similar "sexual conduct, constant verbal interruptions laced with vulgarity, and physical violence." *Id.* at 409. Further, the teacher, assistant principal, and principal, were "repeatedly notified" and "repeatedly informed" about the incidents, yet "the bullying and harassment continued with no real change." *Id.* Ultimately the plaintiff-students transferred to a new school. *Id.*

This Court held that the plaintiff-students alleged a colorable constitutional claim "because the school's deliberate indifference to *ongoing* student harassment created an environment in which plaintiff-students could not learn." *Id.* at 414 (emphasis added). "Deliberate indifference indicates that the government entity knew about the circumstances infringing plaintiff-students' constitutional right and failed to take adequate action to address those circumstances." *Id.* We reasoned that the State must "provide an opportunity to learn that is free from *continual* intimidation and harassment which prevent a student from learning." *Id.* at 412–13 (emphasis added).

*Sneed* should be similarly unavailing because, although also analyzing a *Corum* claim in the educational context, the facts there bear no resemblance to the case at hand. In *Sneed*, we held that public schools may collect "modest, reasonable fees for the purpose of enhancing the quality of their educational effort." *Sneed*, 299

N.C. at 610. We noted that schools must provide a waiver policy for students facing economic hardship in order to protect "equal access to participation in our public school[s]." *Id.* at 618.

The majority relies on *Deminski* and *Sneed* to conclude that "local school authorities may not be deliberately indifferent to extreme, in-school conduct that deprives a student of the opportunity to access a sound basic education on equal terms." Though neither case lends support for such a sweeping standard, the majority applies this standard to conclude that the Board "[e]ffectively punish[ed]" plaintiff by suspending her and then transferring her after the incident. According to the majority, the Board's actions were "clearly unreasonable" and amounted to "deliberate indifference."

But this case is not *Deminski*; at least it wasn't until today. There are at least three flaws with the majority's scant analysis of the allegations in plaintiff's complaint. First, the majority fails to explain how a singular incident of abuse at the hands of a teacher can amount to "deliberate indifference" by the school board. In stark contrast to the "continual" and "ongoing" harassment that took place "[o]ver a period of several months" in *Deminski*, 377 N.C. at 414, the majority concludes that an isolated incident is enough. The majority reaches this conclusion without any facts alleging that the Board was previously made aware of similar behavioral problems with Ms. Dixon or other incidents involving Ms. Dixon and plaintiff, specifically. In fact, in footnote 3, the majority concedes that plaintiff's allegations

regarding Ms. Dixon's lack of licensure as well as the "unspecified earlier 'issues within her classroom' " are "too vague" to state a constitutional claim.

We also note that Ms. Dixon was hired just six weeks prior to the date of the assault. In the absence of specific allegations demonstrating a nexus between Ms. Dixon's conduct during those six weeks and her assault on plaintiff, it is impossible to shoehorn the facts alleged here into the *Deminski* framework which emphasized indifference to "continual" and "ongoing" harassment.[1]

Second, the majority ignores that, at the time of the assault, plaintiff was attempting to enter a classroom she was not authorized to be in at that time.[2] Of course, Ms. Dixon's response to the student's misconduct was egregious. But the fact remains that plaintiff impermissibly entered the classroom and, in doing so, subjected herself to disciplinary action.

School boards have broad discretion to discipline. *See* N.C.G.S. § 115C-391.1 (2025); *id.* § 115C-390.7–390.8 (authority to impose short-term and long-term suspensions); *id.* § 115C-105.48 (authority to transfer students to alternative schools);

---

[1] The majority attempts to bolster its analysis with federal case law analyzing allegations of sex discrimination under Title IX. But federal precedent interpreting Title IX has no bearing on this state's constitutional provisions guaranteeing the right to a sound basic education, and allowing federal Title IX jurisprudence an entry into this area of our state's constitution is concerning.

[2] The complaint alleges that, when the incident occurred, plaintiff was attempting to "retrieve her bookbag" from Ms. Dixon's classroom and "was unable to avoid any contact with Defendant Dixon . . . caus[ing] Minor Plaintiff to strike Defendant Dixon in her arm." Plaintiff's brief provides the additional context that plaintiff "forgot her bookbag" in Ms. Dixon's classroom and "went back inside to retrieve it."

*see also* Alamance-Burlington School System, *Student Code of Conduct* § 4300(b) (2021–22), available at https://core-docs.s3.amazonaws.com/documents/asset/uploaded_file/3260/sahs/2275048/21-22_EngCOC_book_complete.pdf (explaining that violations of the Code of Student Conduct may result in short-term suspensions and placement in an alternative learning program or school). While the majority labels the Board's suspension and transfer of plaintiff as "clearly unreasonable," the complaint did not allege that plaintiff was transferred only because of the incident with Ms. Dixon rather than her own conduct or risk of academic failure. We are not "required to accept . . . unwarranted deductions of fact[ ] or unreasonable inferences as true." *Est. of Vaughn v. Pike Elec., LLC.*, 230 N.C. App. 485, 493 (2013). But by making this inference, the majority lays the groundwork for every routine disciplinary action or transfer to give rise to a constitutional claim against the school board.

Additionally, it would be unreasonable to assume that the Board acted so egregiously. Instead, perhaps the Board was merely made aware that a physical altercation took place between plaintiff and Ms. Dixon when plaintiff attempted to enter Ms. Dixon's classroom without permission, which is exactly what happened. When presented in that light, the Board's initial decision to suspend plaintiff—a decision which was reneged once video of the incident was made available—does not seem so unreasonable. Either way, even accepting the facts of the complaint as true, we just do not know.

And even if the response was unreasonable, the Board was not deliberately indifferent. In fact, by transferring plaintiff out of the school where the abuse occurred, the Board demonstrated just the opposite. While reasonable minds might disagree on whether transferring plaintiff was the most appropriate option, the Board responded, just not in a way the majority likes. But our precedent instructs us to provide deference in these highly factual school discipline cases. *See King v. Beaufort Cnty. Bd. of Educ.*, 364 N.C. 368, 374 (2010) ("[T]he special context of public schools requires a more lenient approach to reviewing the decisions of school officials, and the professional judgments of school officials on school safety and student discipline issues are entitled to appropriate judicial deference." (cleaned up)). Deliberate indifference, per our precedent, is therefore reserved for those situations in which a school board has knowledge of an existing issue and, armed with that information, takes no action to alleviate continual harassment or abuse, as occurred in *Deminski*. At least it was until today.

Lastly, plaintiff's complaint fails entirely to allege a "deprivation" of the right to a sound basic education or when that deprivation might have occurred. As explained above, plaintiff cannot fit into the *Deminski* framework because the allegations do not show deliberate indifference to ongoing harassment. In addition, plaintiff cannot claim a deprivation simply because she was transferred to a new school. School boards have the statutory authority to transfer students to alternative programs. *See* N.C.G.S. § 115C-105.48. "[T]he mere fact that a student has had to

engage in an alternative education program . . . is insufficient to establish a constitutional violation; instead, a plaintiff must show that the program itself was somehow inadequate to provide the opportunity for a sound basic education." *Davis v. Blanchard*, 175 F. Supp. 3d 581, 595 (M.D.N.C. 2016) (interpreting the right to a sound basic education protected by the North Carolina Constitution).

Glaringly, plaintiff's complaint lacks any allegation that the new school failed to provide her the opportunity to a sound basic education. Instead, plaintiff makes the vague claim that her "academic performance . . . was placed in peril" and that she "suffered educational consequences," but she provides no facts to support these assertions. "[A] conclusory allegation . . . should not be sufficient, by itself, to withstand a Rule 12(b)(6) motion to dismiss." *Meyer v. Walls*, 347 N.C. 97, 114 (1997). But the majority's reasoning effectively requires courts to assume that the transfer alone deprived the plaintiff of the right to a sound basic education.

Finally, we note the foreseeable issues with the majority's sweeping standard that school authorities "may not be deliberately indifferent to extreme, in-school conduct that deprives a student of the opportunity to access a sound basic education on equal terms."[3] The majority fails to define "extreme, in-school conduct" or how we

---

[3] The concurrence "emphasize[s] the narrowness of today's decision," asserting that "this case involves . . . an improbable set of alleged facts." But the concurrence fails to engage with the new standard actually articulated by the majority which is inarguably wide-ranging. Disciplinary actions including suspensions and transfers are routinely employed by schools, and the majority makes no attempt to cabin its holding to the specific facts of this case because they can't.

view "on equal terms." We are left wondering if a fist-fight on the middle-school playground which leads to suspension of both participants could give rise to a constitutional claim. How about a food fight in the cafeteria? Does merely transferring a student to another school equate to a denial of equal access? How so? Is the majority saying that school choice is a component of these equal access protections? If so, the majority should be explicit. And if not, the majority should explain how transferring the student to another school somehow denied her equal access to participate in the public schools.

The majority offers no limiting principle. But make no mistake, such a far-reaching declaration lays the groundwork for profiteering attorneys to assert constitutional violations for every grievance a child faces in school because principals and administrators may now be the guarantors of subjective educational equality. Good luck.

Justice DIETZ concurs in Part I of this opinion concerning jurisdiction based on governmental immunity.